# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **2:18-cr-00013-JDL** |
| | ) | |
| **ABIJAH WILLIAMS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER ON DEFENDANT'S MOTION TO WITHDRAW GUILTY PLEA

On January 31, 2019, Abijah Williams pleaded guilty to one count of possession with intent to distribute fentanyl and cocaine base under 21 U.S.C. § 841 (ECF No. 64). He now moves to withdraw his guilty plea (ECF No. 80). After careful consideration, I conclude that Williams has failed to meet his burden of demonstrating a "fair and just reason"—as the First Circuit has interpreted that phrase—to withdraw his guilty plea, and I deny the motion.

## I. PROCEDURAL HISTORY

The procedural history of this case indicates that Williams had difficulty deciding whether to plead guilty or to proceed to trial. On January 26, 2018, the Government indicted Williams on one count of possession with intent to distribute fentanyl and cocaine base. On February 1, the Court appointed Attorney Amy Fairfield to represent Williams, and Williams entered an initial plea of not guilty. Over the next several months, Attorney Fairfield requested multiple continuances and an extension of the deadline for filing pretrial motions on Williams' behalf, and

the Court granted each request.  Attorney Corey McKenna, who was then employed at Attorney Fairfield's law firm, shared responsibilities on Williams' case.

Nearly one year after Williams entered his initial plea of not guilty, a change of plea hearing was scheduled.  Shortly before the hearing date, Attorney Fairfield moved to withdraw as counsel for Williams at his request.  I held a hearing on Attorney Fairfield's motion to withdraw as counsel on January 3, 2019, and denied the motion.  A change of plea hearing was subsequently held on January 25.  During the hearing, Williams decided not to plead guilty, and the hearing was continued at his request.  A second change of plea hearing was held before Judge George Z. Singal on January 31.  At the January 31 hearing, Williams pleaded guilty to the sole count of the indictment, and the Court accepted his plea.

On March 26, Attorney Fairfield and Attorney McKenna withdrew as counsel for Williams, and Attorney Joel Vincent was appointed as substitute counsel. Williams represented that he would seek to withdraw his guilty plea.  On June 18, Attorney Vincent filed a formal motion to withdraw Williams' guilty plea.  The motion asserts that Williams' relationship with his prior counsel was "difficult" and that, despite Williams' "ongoing insistence," Attorneys Fairfield and McKenna had failed to file a motion to suppress the evidence seized at the traffic stop that resulted in his arrest.  ECF No. 80 at 3.  The motion further asserts that Williams' prior attorneys did not inform him of the deadline to file a motion to suppress and that they only showed him certain discovery surrounding the traffic stop after the deadline had passed.

Evidentiary hearings on Williams' motion to withdraw his guilty plea were held on November 18 and December 5, 2019. Williams testified at both hearings. Because Williams voluntarily waived the attorney-client privilege on all issues relevant to the motion, Attorneys McKenna and Fairfield testified as well. The evidence at the hearings centered on the communications between Williams and his attorneys related to his stop and arrest, which Williams contends should have been the subject of a motion to suppress, and the attorneys' reasons for not filing such a motion.

## II.  FACTUAL BACKGROUND

The facts surrounding Williams' stop and arrest are not in serious dispute. Neither party called the officer who performed the stop, Maine State Trooper Matthew Williams, as a witness, but the trooper's written report was received into evidence. In all important respects, the trooper's report is consistent with the testimony by Williams and his former attorneys regarding the stop, arrest, and accompanying searches.

The trooper, an experienced member of the Maine State Police, was traveling northbound on I-95 in York shortly before 9 p.m. on December 19, 2017. He twice observed a gray Infiniti sedan following other vehicles too closely, and he determined by radar that the vehicle was operating at 79 miles per hour in a 70-miles-per-hour zone.

He followed the vehicle without activating his lights or siren. The vehicle abruptly exited in Wells, and the trooper continued to follow it through the toll plaza.

3

The vehicle then quickly pulled into the toll plaza's employee parking lot. The trooper activated his cruiser's blue lights and approached the stopped vehicle. He obtained the driver's licenses of the operator, Abijah Williams, and a female passenger. Williams and the passenger told the trooper that they were lost. Williams stated that he was trying to go to Augusta, but then claimed he was going to Skowhegan to meet friends. When asked who his friends were, Williams struggled to think of their names. He appeared rigid and tense to the trooper, and his hands were shaking. Based on Williams' abrupt exit from I-95, his nervous demeanor, and the vague and inconsistent responses that he and his passenger gave when asked where they were going, the trooper suspected that the two were engaged in criminal activity. The trooper asked Williams to stand outside the vehicle and called for a drug-sniffing dog.

The trooper also ran Williams' information in his computer system and learned that Williams was on parole[1] in Connecticut for attempted homicide, and that Williams was subject to a Connecticut protective order[2] in which the female passenger was the named protected person. The information available to the trooper did not specify what restrictions were included in the protective order. However, based on his experience, the trooper surmised that the protective order prohibited Williams from having contact with the passenger. Both Williams and the passenger

---

[1]  The trooper's report and the testimony at the hearing alternately refer to "probation" and "parole." The distinction does not change the analysis here, so for consistency, I use the term "parole."

[2]  "Court orders protecting one individual from another are variously referred to as protection orders or protective orders." *United States v. Perkins*, 421 F. Supp. 2d 209, 211 n.3 (D. Me. 2006). The parties have used the terms interchangeably. I use the term "protective order" in keeping with the terminology used by Connecticut statutes and the Connecticut Supreme Court. *See, e.g., State v. Fernando A.*, 981 A.2d 427 (Conn. 2009).

told the trooper that the protective order had been rescinded and that they were permitted to have contact.  Nonetheless, the trooper arrested Williams for violating the protective order, handcuffed him, and placed him in the back of the police cruiser.

Following his arrest, Williams told the trooper that his parole officer's phone number was in his phone, which was in the vehicle Williams had been driving.  He gave the trooper permission to retrieve the phone from the driver's side of the car. The trooper returned to the vehicle and opened the driver's-side door to look for the phone.  He then saw a small, folded envelope in plain sight on the driver's-side floorboard.  The envelope bore a blue lightbulb ink-stamp.  Based on his training, education, and experience, the trooper recognized the envelope as packaging for a ½-gram dose of heroin.  The trooper opened the envelope and observed that it contained a brown substance, which he believed was heroin.

The police dog and its handler then arrived and conducted a dog sniff around the vehicle.  The dog alerted to the odor of narcotics on the vehicle.  At that point, the trooper searched the vehicle and discovered a box containing 400 envelopes of heroin and 45 grams of cocaine base in the engine compartment.  Additionally, a sandwich bag containing heroin was found on the ground near another trooper's cruiser.

Both Williams and the passenger were transported to the Troop G Barracks in Portland.  After waiving her *Miranda* rights, the passenger explained that Williams told her the following: that Williams knew that the trooper had been following him on the highway and that Williams believed he was about to be pulled over.  She also stated that Williams had given her the sandwich bag containing heroin and told her

to hide it, which led her to throw the bag under the police cruiser.  She also told the trooper that she knew Williams was trafficking drugs and that she had made several trips with him to do so.  She explained that Williams had been physically abusing her and showed the trooper several bruises and cuts on her body.

### III.  LEGAL STANDARD

"A defendant does not have an absolute right to withdraw a guilty plea." *United States v. Gates*, 709 F.3d 58, 68 (1st Cir. 2013) (citing *United States v. Negrón-Narváez*, 403 F.3d 33, 36 (1st Cir. 2005)).  However, a defendant may withdraw a guilty plea prior to sentencing, even if the court has already accepted the guilty plea, if he or she can show a "fair and just reason" for requesting the withdrawal.  Fed. R. Crim. P. 11(d)(2)(B).  The defendant bears the burden of making this showing.  *See United States v. Caramadre*, 807 F.3d 359, 366 (1st Cir. 2015).

To determine whether a "fair and just reason" justifies the withdrawal of a guilty plea, courts examine five factors: (1) "whether the plea was knowing, voluntary and intelligent within the meaning of Rule 11," (2) whether "the proffered reason for withdrawing the plea" is plausible, (3) whether the request to withdraw the plea is timely, (4) "whether the defendant asserted his innocence," and (5) "whether the plea was pursuant to a plea agreement." *United States v. Richardson*, 225 F.3d 46, 51 (1st Cir. 2000) (quoting *United States v. Cotal-Crespo,* 47 F.3d 1, 3 (1st Cir. 1995) and *United States v. Aker,* 181 F.3d 167, 170 (1st Cir. 1999)).  The first factor is the most significant.  *See United States v. Isom*, 580 F.3d 43, 52 (1st Cir. 2009) (collecting cases).  If the "combined weight" of the five factors suggests that there is a fair and just reason for the defendant to withdraw his guilty plea, a court then considers any

6

prejudice to the government that would be caused by the withdrawal. *Gates*, 709 F.3d at 69 (quoting *United States v. Doyle*, 981 F.2d 591, 594 (1st Cir. 1992)).

I evaluate each of these factors in determining whether to grant Williams' request to withdraw his guilty plea. In this case, some factors overlap significantly, and others are either inapplicable or undisputed by the parties. I therefore focus primarily on the critical first factor—whether Williams' plea was knowing, voluntary, and intelligent—which is disputed by the parties.

## IV.  ANALYSIS

### A.    Whether the Plea Was Knowing, Voluntary, and Intelligent

Williams maintains that his plea was not knowing, voluntary, and intelligent because in pleading guilty, he involuntarily and unknowingly "surrender[ed]" his opportunity to file a motion to suppress evidence. ECF No. 80 at 3. To demonstrate that his plea was not knowing, voluntary, and intelligent, Williams must establish either that the district court judge who accepted his plea failed to satisfy the requirements of Fed. R. Crim. P. 11(b), *see United States v. Kobrosky*, 711 F.2d 449, 455 (1st Cir. 1983), or that he received ineffective assistance of counsel, *see United States v. Gonzalez-Arias*, 946 F.3d 17, 28−29 (1st Cir. 2019). Williams concedes that the plea colloquy at his change of plea hearing satisfied Rule 11(b). I have reviewed the transcript of the change of plea hearing and independently reach the same conclusion. Thus, I focus on the second method, and Williams' central argument: that his attorneys' ineffective assistance prevented him from knowingly, voluntarily, and intelligently pleading guilty.

A defendant contending that his or her counsel was ineffective must meet the two familiar *Strickland* prongs: "that counsel's performance fell below an objective threshold of reasonable care and that this deficient performance prejudiced him." *Caramadre*, 807 F.3d at 371 (citing *Turner v. United States,* 699 F.3d 578, 584 (1st Cir. 2012) and *Strickland v. Washington,* 466 U.S. 668, 687 (1984)).   In the plea-withdrawal setting, "the prejudice element requires a showing of 'a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial.'" *Id.* (quoting *Moreno–Espada v. United States,* 666 F.3d 60, 64 (1st Cir. 2012)).

Williams contends that his lawyers were ineffective because they (1) failed to file a motion to suppress the evidence seized at the traffic stop leading to Williams' arrest; (2) failed to apprise Williams of the deadline for filing such a motion and failed to inform him when it lapsed; and (3) failed to show Williams the dashcam footage of the stop before the filing deadline had passed.

## 1.   Counsel's Failure to File a Motion to Suppress

Williams argues that his counsel were ineffective because they failed to file a motion to suppress evidence obtained at the traffic stop.[3]   Williams contends that a motion to suppress could have succeeded because the traffic stop and his subsequent arrest were unlawful.   Because Williams maintains that a successful motion to

---

[3] I reiterate that neither Williams nor the Government introduced the dashcam footage or called the trooper as a witness at the evidentiary hearings, and therefore my findings as to what transpired surrounding Williams' arrest derives from the trooper's report and the sworn testimony of Williams' former attorneys.   Their testimony as to their evaluation and determination of the facts underlying Williams' arrest was not seriously called into question.   To the extent any of Williams' testimony conflicted with that of Attorney McKenna or Attorney Fairfield, I specifically find the latter witnesses more credible based on my evaluation of each witness's demeanor and veracity.

suppress on either of these bases would have rendered all of the Government's evidence against him inadmissible, he argues that he would not have pleaded guilty if his counsel had filed a motion to suppress.

### a. Prejudice

I address each potential basis for suppression in turn, focusing first on whether Williams has demonstrated prejudice by his attorneys' failure to file a motion to suppress, or, in other words, whether there is a reasonable probability that he would not have pleaded guilty if they had.   I then separately discuss whether counsel performed deficiently.

### i. The Reason for the Stop of the Vehicle

Williams first contends that his attorneys should have filed a motion to suppress because the trooper had no grounds to conduct a traffic stop, and therefore any evidence obtained as a result of the stop should have been suppressed.   However, "[a]n officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else." *United States v. McGregor*, 650 F.3d 813, 820 (1st Cir. 2011).   As previously explained, the trooper observed that Williams' vehicle was speeding and driving too closely to other vehicles.   Williams subsequently pulled his vehicle over and parked it at a toll plaza, and the trooper who was following him then turned on his blue lights.

Williams argues that the dashcam footage was deceptively spliced to make it appear as if he were committing traffic violations, but Williams did not offer the video or present any other evidence at the evidentiary hearings that would call into

question the trooper's conclusion that Williams' car was speeding.   Moreover, Attorney Fairfield testified that she "fully exhausted and vetted" Williams' claim that the video was altered and concluded that the claim was without merit.[4]  Putting aside the dashcam video, the trooper reported that based upon radar, Williams' vehicle was traveling nine miles per hour over the posted speed limit. Attorney McKenna also testified that, in his judgment, the evidence demonstrated that Williams had been speeding.

Because the evidence unquestionably establishes that the traffic stop was supported by the trooper's observations of traffic violations, Williams has not demonstrated that his counsel's failure to challenge the lawfulness of the stop by filing a motion to suppress was prejudicial.

### ii.  The Reason for Williams' Arrest

Williams next contends that he was prejudiced by his attorneys' failure to challenge his arrest, and the evidence obtained following it, through a motion to suppress.  Specifically, Williams asserts that the trooper did not have probable cause to arrest him for violating an out-of-state protective order because the trooper did not first determine whether Williams' conduct was specifically prohibited by the protective order.  Williams maintains that, on the contrary, the information available to the officer indicated that the protective order had been modified and that Williams

---

[4]  Attorney Fairfield testified that she thought Williams' desire to have the video examined to determine whether it had been altered was "outlandish."  She nonetheless proposed to Williams that she would have someone with technical expertise review the footage, but Williams declined, insisting that Attorney Fairfield hire a person from the dashcam company itself.  "[S]everal First Circuit cases have upheld counsel's right to ignore frivolous claims pressed by clients."  *United States v. Hart*, 933 F.2d 80, 83 (1st Cir. 1991).  Accordingly, I find that counsel was not ineffective by rejecting Williams' request here.

and the passenger had told the trooper that the protective order had been rescinded. Williams further asserts that the arrest was not supported by probable cause because it was motivated by the trooper's desire to search the vehicle rather than a legitimate law enforcement objective.

Even assuming that the trooper's failure to determine the terms of the protective order negates probable cause—a question I do not decide—Williams would only be able to establish prejudice based on his attorneys' failure to file a motion to suppress on this basis if the unlawful arrest could justify suppression of the evidence against him. However, as I will explain, suppression would not be warranted under these circumstances because the trooper inevitably would have discovered the same evidence through independent, legal means. *See United States v. Almeida*, 434 F.3d 25, 28 (1st Cir. 2006) (citing *Nix v. Williams,* 467 U.S. 431, 444 (1984) and *United States v. Pardu*, 385 F.3d 101, 106 (1st Cir. 2004)).

An officer violates the Constitution's protection against unreasonable seizures during a lawful traffic stop if he or she exceeds the time necessary to handle the matter for which the stop was made. *See Rodriguez v. United States*, 575 U.S. 348, 350 (2015). However, "while an officer's actions must bear some relation to the purpose of the original stop, he may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention." *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001) (citing *United States v. Sowers*, 136 F.3d 24, 27 (1st Cir. 1998)). Here, the trooper plainly had reason to prolong Williams' stop based on his understanding that Williams and the passenger were

11

named parties to a protective order and his knowledge that protective orders generally prohibit direct contact between the parties named on it.

The trooper learned the identities of Williams and his passenger after speaking with them, and "police requests for identifying information typically do not trigger Fourth Amendment concerns." *United States v. Fernandez*, 600 F.3d 56, 60 (1st Cir. 2010) (citing *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 185 (2004)). Next, the trooper transmitted an inquiry regarding Williams and learned that there was a protective order involving him and his passenger. It is appropriate practice for an officer conducting a traffic stop to determine whether there are any outstanding warrants against the driver. *See Rodriguez*, 575 U.S. at 349. Furthermore, under Maine law, it is a crime for an individual to violate "[a] temporary, emergency, interim or final protective order . . . or a similar order issued by . . . another state" when the individual has had prior notice of the order. 19-A M.R.S.A. § 4011(1)(A) (West 2020); *see also State v. Blum*, 187 A.3d 566, 575 (Me. 2018).

Although the information that the trooper received did not reveal the specific protections ordered by the protective order, the trooper understood, based on his experience, that protective orders typically prohibit physical contact between the subjects of the order. And an officer "may rely on probabilities in the reasonable suspicion context." *Kansas v. Glover*, 140 S. Ct. 1183, 1190 (2020) (finding reasonable suspicion to initiate traffic stop based on knowledge that the registered owner of a vehicle had a suspended license and on an inference that the current driver was the

registered owner).[5]   Although Williams argues that both he and his passenger informed the trooper that the protective order had been rescinded, until the trooper could learn more, the trooper was not bound to accept these claims as true.   *See United States v. Arvizu*, 534 U.S. 266, 277 (2002) ("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct.").

Thus, even if the trooper did not have probable cause to arrest Williams, the trooper had reasonable suspicion sufficient to detain Williams for a reasonable amount of time until the trooper could obtain further information about the protective order's restrictions.  *See United States v. Tiru-Plaza*, 766 F.3d 111, 117 (1st Cir. 2014); *see also* 19-A M.R.S.A. § 4011(3) ("The law enforcement officer may verify, if necessary, the existence of a protective order by telephone or radio communication with a law enforcement agency with knowledge of the order.").   Although there was no direct evidence presented as to the precise length of time Williams was detained before the police dog and its handler arrived, Williams has not suggested that the length of time was unreasonable.   Thus, I conclude that the trooper's reasonable suspicion was sufficient to detain Williams at least until the arrival of the police dog and its handler.   At that point, the dog alerted to the odor of narcotics on the vehicle, providing probable cause to search it.   *See United States v. Brown*, 500 F.3d 48, 57

---

[5]  Williams also maintains that the trooper improperly arrested him based upon his knowledge of Maine law, not of Connecticut law where the protective order was issued.  However, 19-A M.R.S.A. § 4011(1)(A) clearly makes it a crime for an individual to violate a protective order from another state and the trooper could rely on the probability that a Connecticut protective order would prohibit contact between the persons it named.

(1st Cir. 2007) ("[A] reliable canine sniff outside a vehicle can provide probable cause to search the vehicle.").[6]

Accordingly, Williams has not shown that he was prejudiced by his attorneys' decision not to file a motion to suppress evidence following Williams' arrest for violating the protective order.[7]

### b. Deficient Performance of Counsel

Even though Williams has not demonstrated prejudice from his attorneys' decision not to file a suppression motion, I address the other *Strickland* prong: whether counsel's performance fell below an objective threshold of reasonable care. Given the weak grounds for seeking exclusion, Attorney McKenna testified that he felt Williams would be better served in taking what he perceived to be a favorable plea agreement from the Government than in filing a motion to suppress and potentially receiving a worse offer from the prosecutor. Attorney Fairfield also relayed to Williams that the terms of the Government's offer were "extremely favorable" because Williams' sentencing guidelines range was "exponentially higher" than the sentence the Government had indicated it would seek.

As noted above, the inquiry at this stage concerns the reasonableness of Williams' attorneys. "That another lawyer might have taken a different slant is beside the point; . . . 'strategic choices made after thorough investigation of law and

---

[6]  Williams has not raised any challenge as to the dog's reliability.

[7]  At the hearing, Williams also suggested that his prior attorneys should have moved to suppress his responses to questions from the trooper after his "arrest" since he had not been read his *Miranda* rights. Williams, however, has not conveyed the content or substance of his statements to the Court. I thus cannot find prejudice to Williams or ineffectiveness of counsel on this basis.

facts relevant to plausible options are virtually unchallengeable' in ineffective assistance litigation." *United States v. Pellerito*, 878 F.2d 1535, 1540 (1st Cir. 1989) (quoting *Strickland*, 466 U.S. at 690). "'Effectiveness' does not require that counsel jump through every conceivable hoop, or engage in futile exercises." *Id.* Here, Williams' attorneys decided not to pursue a motion to suppress based on their reasonable judgments that the motion had no "legitimate shot" at success and that the Government's plea offer was favorable. *Id.* Thus, Williams' attorneys were not deficient in failing to file a motion to suppress.

### 2. Counsel's Failure to Inform the Defendant of the Deadline for Pretrial Motions

Williams next contends that his attorneys were ineffective by not informing him of the deadline for filing pretrial motions. However, Attorney McKenna testified that he undertook an extensive evaluation of all of the possible grounds that might be asserted in a motion to suppress. He met with Williams at the Cumberland County Jail in the days leading up to the deadline for pretrial motions to discuss with Williams the possibility of filing such a motion. That testimony was corroborated by his contemporaneous description of his activities contained in his billing logs. Attorney Fairfield testified that she spoke with Attorney McKenna regularly about the case and learned from him that Williams knew of the deadline. Although Attorney Fairfield did not have a specific recollection of her own conversation with Williams about the deadline, she testified that she was "sure [they] talked about that." She testified that if she had determined that there was a good reason to file a motion to suppress after the deadline passed, she "absolutely" would have asked for

an extension of time to file one and "fallen on [her] sword" if necessary.  She also testified that she had explained this point to Williams.  Based on this evidence, I find that Williams' attorneys informed him of the legal issues surrounding any potential suppression motion as well as the deadline for filing it.

The evidence also shows that Williams struggled to finalize his decisions at critical junctures in his case and would frequently change his mind.  The indecision Williams experienced is understandable given the difficult choices he faced, and "[i]t is human nature for defendants to wonder what would have happened if they had put the Government to its proof and later to rue their decisions to plead guilty." *United States v. Leland*, 370 F. Supp. 2d 337, 343 (D. Me. 2005), *aff'd,* 196 F. App'x 9 (1st Cir. 2006).  But Williams' doubts do not render the assistance provided by counsel ineffective, and they are not reasons to undo an otherwise valid guilty plea.  *See id.* at 343–44.

Thus, based on all the evidence before me, I conclude that Williams' attorneys were not deficient in relaying the deadline for filing pretrial motions.  Moreover, as explained above, Williams has not demonstrated prejudice from his attorneys' decision not to file a motion to suppress.  Accordingly, even if Williams' attorneys failed to relay the filing deadline and were ineffective in doing so, Williams would not have been prejudiced.

### 3.  Counsel's Failure to Show the Defendant Certain Discovery

Williams next asserts that his attorneys were ineffective because they unreasonably delayed showing him the dashcam footage of the stop as he specifically

requested.  On June 14, 2018, Attorney McKenna sent Williams a letter stating that he would work on a way for Williams to view the dashcam video of the stop at the Cumberland County Jail.  Williams was not shown the video until six months later, on January 22 and 23, 2019.  Both Attorney McKenna and Attorney Fairfield testified that it is not difficult to arrange to show an incarcerated client a video at the jail, and they offered no explanation for their failure to show Williams the video sooner.

I need not opine on whether the delay in showing Williams the dashcam video amounted to constitutionally deficient representation, because Williams has failed to show the requisite prejudice required for relief.  *See Gonzalez-Arias*, 946 F.3d at 28–29 (finding no prejudice based on defendant's claim that his counsel failed to show him video and audio evidence before the government's plea offer lapsed).  Williams did not introduce the video at the evidentiary hearing on his motion to withdraw his guilty plea, and he has not provided any plausible explanation as to how it might have changed his decision to plead guilty.  To the extent Williams maintains that it would have formed the basis for a motion to suppress, as I have already addressed, Williams has not demonstrated prejudice from the absence of a motion to suppress based on the video's contents, and it follows that his attorneys' delay in showing him the video did not, in and of itself, cause prejudice.  Moreover, although Williams first saw the video after the deadline for pretrial motions had passed, Williams' attorneys had discussed its contents with him at length, and Williams viewed the video prior to his guilty plea.  Accordingly, Williams has not demonstrated prejudice resulting from his attorneys' delay in showing him the dashcam footage.

17

Because Williams has not shown that he was prejudiced by his attorneys' performance, I conclude that he did not receive ineffective assistance of counsel. Accordingly, I find that he entered his guilty plea knowingly, intelligently, and voluntarily. Thus, the first factor of the "fair and just reason" analysis prescribed by the First Circuit weighs against permitting Williams to withdraw his guilty plea.

## B.    The Force of Defendant's Reason for the Change of Plea

I turn now to the second factor of the "fair and just reason" analysis: the plausibility of the defendant's reason for requesting withdrawal. Because Williams' arguments as to the strength of his reasons for withdrawing his guilty plea mirror those from the first factor, my analysis as to this second factor is the same. Accordingly, I conclude that the second factor cuts against granting the relief Williams seeks. *See United States v. Goguen*, No. 1:11-cr-00003-JAW, 2019 WL 4246676, at *18 n.5 (D. Me. Sept. 6, 2019) (rejecting arguments under second factor that duplicated those rejected under first factor); *United States v. Fernández-Santos*, 856 F.3d 10, 15−18 (1st Cir. 2017) (addressing the first two plea withdrawal factors jointly).

## C.    The Timing of the Motion

As to the third factor, the Government concedes that, given the history of the case and the appointment of substitute counsel, the timing of Williams' motion was reasonable. This factor, therefore, weighs in Williams' favor.

## D.    Assertion of Innocence

With respect to the fourth factor, courts "look more hospitably on a motion to withdraw a guilty plea when the motion is coupled with an assertion of innocence."

18

*Doyle*, 981 F.2d at 596.  Conversely, the absence of an assertion of innocence weighs against a defendant.  *Id.*  In this context, a defendant "must put forward 'factual contentions' that create a 'legally cognizable defense' to the charges."  *Fernández-Santos*, 856 F.3d at 19 (quoting *United States v. Ramos*, 810 F.2d 308, 312 (1st Cir. 1987)).  But "[m]erely voicing a claim of innocence" carries no weight; "the claim must be credible."  *Gates*, 709 F.3d at 69 (citing *United States v. Sanchez–Barreto,* 93 F.3d 17, 24 (1st Cir. 1996)).  Indeed, "[t]here are few if any criminal cases where the defendant cannot devise some theory or story which, if believed . . ., would result in his acquittal."  *Kobrosky*, 711 F.2d at 455 (alteration in original) (quoting *Nunez Cordero v. United States*, 533 F.2d 723, 726 (1st Cir. 1976)).

Williams does not claim that he is actually innocent.  He does, however, claim that he is legally innocent because suppression of all the evidence against him is warranted.  I am not persuaded.  As made clear by my determination that Williams was not prejudiced by his attorneys' decision not to file a motion to suppress, Williams has not made a plausible assertion of innocence.  *See United States v. Dunfee*, 821 F.3d 120, 131 (1st Cir. 2016).  Thus, the fourth factor does not support the relief Williams seeks.

## E.   Plea Agreement Entered Into and Breached

Because Williams did not enter a plea agreement with the Government, the fifth factor does not apply.  *See Goguen*, 2019 WL 4246676, at *5 n.3.

19

**F.      Prejudice to the Government**

Based on the foregoing analysis, I conclude that the collective weight of the first five factors does not lean in Williams' favor.  Thus, I do not assess whether the Government would be prejudiced if withdrawal were permitted.  *See, e.g.*, *id*. at *21.

## V.  CONCLUSION

For the preceding reasons, I conclude that Williams's guilty plea was knowing, voluntary, and intelligent, and that Williams has failed to establish a "fair and just reason" supporting the withdrawal of his guilty plea.  It is therefore **ORDERED** that Williams' Motion to Withdraw Guilty Plea (ECF No. 80) is **DENIED**.

**SO ORDERED.**

**Dated this 26th day of May, 2020.**

_____/s/ JON D. LEVY_____
**CHIEF U.S. DISTRICT JUDGE**

20